May it please the Court, good morning. Robert Swain for Appellant, Mr. Basulto-Pulido. While there are many issues in the appeal, and I'm willing to answer questions on any of the issues, I intend to address three issues in oral argument this morning. First, that the underlying deportation was obtained in violation of due process and therefore ineligible to be used as an element of the criminal offense. Second, that the Court erred by failing to instruct the jury they had to find lack of official restraint. And third, that there was a premeditated error at sentencing, especially in light of the reasoning in Sandoval. How long has your client served as of today? As of today, two years. So if we were to agree with you that Kovia and Sandoval required the jury to determine the date of the prior deportation, then he should be subject to immediate release, right? That would be correct, yes. All right. If released, would there be a deportation? Would the immigration subsequent? Right. I don't know. I believe the probation report shows that there's a hold on him. So whether he would be released. So we can't enter an order giving him an unqualified release, just subject to any hold? Well, it would be an unqualified release from prison. And then immigration has their usual practices within a day or two. And then he would be deported to Mexico, presumably. Yeah. And would that move your other claims or not? Well, I guess, I mean, in the sense that if the Court's asked me, I mean, I don't know if it requires to withdraw the new trial. I wouldn't move, I guess, the motion to dismiss. But in terms of the other claims, you know, in the ---- But he still has a conviction and he's under supervised release, no matter what. He would be under supervised release. Are we sent it back for resentencing? Well, I think that, I mean, of course, the relief we're seeking is both dismissal of the indictment and new trial. If it's just a sentencing issue, then it would be sent back with an order to sentence to no more than two years. The thing is, you wouldn't really want a new trial if he's already served his time, right? No, but he still has the limited time for three years, right? Which he wouldn't get on a resentence. I'm not sure. Supervised release. Well, he would be subject to supervised release, but I'm sure that that is, if the Court is with us on that, I'm sure that's a risk he's willing to assume in order to be released right now. I think the Court, however, would still have to address the issue of ---- The motion to dismiss the indictment. Right. So suppose we agree with you that the motion to dismiss the indictment should be granted and it's dismissed and he's already served two years. What happens in that case? There's a release order. But does the government then retry him because we dismissed the indictment or does his conviction, his release order and his convictions erased? Is that it? His convictions erased. And, of course, the government could not go forward because that's the only deportation in his record. And so it's not like the government could refile. Couldn't they prosecute him for a misdemeanor? I'm not sure if they would have statute of limitations or speedy trial act problems in that regard. Or double jeopardy. But, of course, that would be a six-month maximum, which he's served four times over. Practically, if we agree with you on the motion to dismiss, it's probably unlikely the government would. I'm sorry. It's probably unlikely, just practically speaking, if we were to agree with you on the motion to dismiss, that the government would try to prosecute him again. Right. Especially under these facts. I mean, I can't imagine it in general, but under these facts, where there's a single deportation hearing in front of a judge, there's nothing that they could come back and say on a 1326 because there would be no lawful deportation order. Well, the best result for you is to get the whole judgment and sentence set aside, isn't it? That's the best. And the next best is to just get the sentence set aside completely. Or not necessarily set aside, but with the specific order that under Covian, the statutory max is two years. Yes. He's served the two years and should be. The predicate legal reason for setting aside the judgment. Right? I'm not sure I followed the question. I'm sorry. Well, if we found that two years was the maximum time and on that basis, we set aside the entire judgment, including any offense within the charge defense, he would be home free of any effect of this judgment, wouldn't he? He wouldn't want this conviction on the record in case he comes back. Right. Yeah. Yeah. That's what I'm saying. I mean, you wouldn't want it of record. Correct. I mean. Let's say he had a prior conviction. Well, not only I think that we wouldn't want him to have a prior conviction, but our position is as of now there's no valid deportation that exists in his record at all. And so I'm not sure whether that becomes res judicata if the conviction in this case is upheld. He's deported this time and reenters. He's got an entirely new problem. That's correct. So why is the prior removal proceeding invalid? The prior removal proceeding is invalid because the government concedes that at that time in December of 1997, Mr. Basulto Pulido qualified for what's called fast-track voluntary departure. The BIA has made it clear that in order to conform with due process, the immigration judge must tell the alien that this relief is available and explain what you have to do to qualify, which includes conceding the ground of removal, includes agreeing not to appeal, and showing that you don't have an aggravated felony. You know, there's no dispute that he statutorily qualified. There's no dispute that the excerpt of record at 50 to 57 is the entire deportation hearing, that he wasn't told how you apply, what factors you need to show. And, in fact, it appears from the court's, the IJA's, summary statement that she was under the belief that this was old-style voluntary departure and that the fact that he had a criminal conviction would preclude him from obtaining the relief. It does appear she didn't know of this relief. She didn't know of the fast-track relief. That's what it appears. Or she just overlooked it. Either she didn't. We would like to believe that. She was a reasonably competent immigration judge who would have been aware of the change in the law that year, the preceding year. And because, you know, the only statutory bar is an aggravated felony, which, of course, he didn't have. And he had the type of equities that normally would cry out even in a higher standard of voluntary departure. Been here since he was four years old. No prior record with immigration at all. No deportations. No voluntary returns. Three United States citizen children. The rest of his family in the United States. Schooling in the United States. And it appeared that the immigration judge thought that because he had the criminal conviction, the misdemeanor domestic violence, that it would he was precluded. Let me ask you another question. If we decide that the deportation is invalid, do we reach the question of the free from official restraint? No. Because if you agree with the appellant on that, then the remedy is the motion to dismiss the indictment must be reversed. And so the indictment is dismissed. So you would not reach the official restraint. And I don't think you wouldn't reach any other issue, including the COVID in Sandoval. Except we would have to order him released or something. Right. I guess I would ask for the additional remedy that the court, even subject, I don't know, the government's petitions re-hearing or whatever, that the court still order his immediate release because of the amount of time that he served. Because even if the court was wrong, let's just say the Supreme Court reversed on this. He served his two years under COVID in Sandoval. So that would be my request. I don't know if the court wants to hear about the official restraint. I'm sort of chomping at the bit to address that because it's just I'll save at least three minutes for rebuttal. But on the official restraint, in a case where the trial court says it's a close case on the Rule 29, on the official restraint issue, and then refuses to instruct the jury. It, I think, would be analogous situation to an entrapment case where the judge finds, you know what, it's so close. I'm almost going to give you a Rule 29 because of entrapment and the government's failure to prove beyond a reasonable doubt that you weren't entrapped. But then, well, I've already decided it, so the jury's not going to get to decide it. I mean, the Ninth Circuit model instruction on 1326 now includes a paragraph that there has to be official restraint when there's evidence. And here, the appellant is seen crossing into the United States, seen stopping 100 yards. During that time, the scope operator already has the two guys on the ATV, the two agents on the ATV, on the way. So at a minimum, it's a jury question, if not an outright acquittal under Pacheco. I guess I'd like to reserve my additional time. Good morning. May it please the Court. I'm Assistant U.S. Attorney Rebecca Young, and I represent the United States in this matter. I think at the outset it would help if I knew what was of most concern to the Court. I think there are two main issues that you've highlighted so far. First, the 1997 removal and whether or not the immigration judge did inform the defendant of the various forms of relief that he might have been entitled to. And then, of course, the Cobie and Sandoval issue, whether or not the ---- Well, yeah. I think those are ---- well, if we were to find that the prior deportation, Pussing did not comport with due process and he was ---- which you've already conceded that he was eligible for relief, that would be a form of prejudice. So that would require us to dismiss the indictment, which means there's no prior ballot. Well ---- Right. Because the 2004 removal, of course, was a reinstatement of the ---- 1997. Well, and every removal after 1997. Right. Exactly. So 1997 is the critical one. Exactly. And so if we were to decide that, then we really don't need to reach any of the other issues. Right. But ---- and in this case, and that's actually why both the 1997 and the 2004 removal were presented to the jury at trial in this case. But as we noted in our brief, at the 1997 removal hearing, the immigration judge clearly spoke about voluntary departure. She did not use the exact phrase, fast-track voluntary departure. Is there a difference between the old-style voluntary departure and the new fast-track voluntary departure? That's exactly right. And the fast-track voluntary departure is a way to basically bypass the restrictions that are in ---- that are under the voluntary departure form of relief. But at the end of the day, it's still a matter of discretion for the immigration judge. And she expressed ---- Shouldn't he have a chance? Shouldn't the immigrant have a chance to apply for it and to, you know, to make a case for it? Well, but in this case, I mean, what you have is a judge ---- well, first ---- What you're saying is, well, we can look, you know, here, even if he had applied for it, she would have denied it. How do we know that? I'm sorry? How do we know that she would have denied it? Well, I think that's what the judge ---- Well, she never had a chance to make his best case. But she had all the facts before her at that time. And you also had, I think what's clear from reading the transcript, is someone who ---- But it wasn't put together in an application or, you know, in a packaged way. He didn't have a chance to really argue why he should get fast-track voluntary departure. Well, but it's not any ---- I mean, slice and dice it. He just didn't get that chance to make his pitch. I mean, I think from reading the transcript, you can tell that she essentially jumped forward. Right? You know, she said, even if you ---- even if I were to consider it, I would deny it, based on what I know about you. But, you know, she says a voluntary departure. And then she starts talking about a different law. She's not talking about fast-track voluntary departure here. And as I'm counting it, I'm looking at this transcript. And she makes, I count, four wrong statements of the law to the defendant here. Absolutely incorrect statements of the law, including that with your conviction record, I would not be able to favorably consider voluntary departures in spite of the equities that you have here in the United States. That is wrong in light of the law that was enacted. I can't remember which date, but the recently enacted voluntary departure fast-track statute. And the other thing on the exercise of eligibility, I mean, on the exercise of discretion is my understanding of this history of this fast-track voluntary departure is that it actually was instituted in part to help the government just get rid of people, right? And so it's kind of one of those things that you would think, you would expect that the IJs would say, okay, because you don't go all the way through all the proceedings. It's cut short. It's kind of like this fast-track stuff that's going on. Right. And so it's in everybody's interest that this occur, and if he's eligible for that, which he is, I don't know why she wouldn't do it. But she doesn't think he's eligible because she's mistaken as to his criminal record. She draws conclusions from that that are erroneous under voluntary departure as well as cancellation of removal. And so, you know, I just don't, if she had been informed of all the law and correctly and advised him as to the correct law, then it just seems that, and anyway, it only has to be a plausible ground for relief. It seems like it's more than plausible. Well, it seems like you should really err on the side of caution and over-inform rather than under-inform. I mean, I think we have to concede that. But what we also noted in our brief to this Court was even if, you have to look at the entire timeline as well, because even, because the defendant still has to show prejudice in this case, right, in order to collaterally attack. A plausible ground for relief is how prejudice is defined. But he was continually removed after that 1997 removal, including after 2001 when he does gain that aggravated felony conviction and is ineligible for any form of voluntary departure. So, for example, all of his removals after that point, had they not been ---- But we're looking at the 97, aren't we? Right. Your indictment is based on the 97, and you tried the case based on the 97 removal, and everything else is a reinstatement. Right.  No, that's true. That's true. But when we look at how prejudiced was he by that reliance, I mean, what would have happened inevitably after 2001, had that 1997 removal not happened, is that he would have had, again, a formal removal hearing before an immigration judge, and he would have been removed rather than ---- they could reinstate after 97 because they had the client, but let's take that out of the equation. Your argument is getting really, really even more speculative than just because, okay, suppose he was properly advised, you could do fast-track removal, they fast-track removal, it goes back to Mexico, and he decides to stay. Mm-hmm. I mean, we don't know whether the subsequent reinstatements and statements would have occurred or not. No, but I don't think it's speculative to state that if that 97 IJ hearing had not taken place, he would have, and he chose to come back after, and he did, after that aggravated felony conviction, a formal hearing would have had to take place in order to remove him. There could not have been a reinstatement if the 97 removal was taken out of the equation. And then we'd have to look at that one to see if that was valid. Right. Yes, that's true. But that's so hypothetical because it's not, I mean, that's nothing that's in front of us. But I think the point of that is that he, after 2001, in no way, shape, or form was he eligible for either fast-track or — Just look at what happened at the hearing in the 97. When he was in front of the immigration judge, should she have advised him of the possibility of applying for fast-track voluntary departure? And was there reasonable, was it reasonably plausible that he would be eligible for it? True, it was discretionary, but it seems to me that he should be able to have the opportunity to apply for it and to make his best case for it. He didn't get that. But I think in this particular case, the judge was also faced with, and you can, it's plain from reading the transcript, that she was faced with someone who wanted to, just wanted to get it done. No, no. He wanted to get out. He was in detention. He wanted to get out of detention. He wanted to get out on bond. So fast-track voluntary departure, he would have jumped on it because that's all he wanted. He didn't want to go out and litigate what his crime was, and he didn't want to get a lawyer. He just wanted to get out of jail. That's all. But when the judge gave him the opportunity to have his wife there, or excuse me, his family there, and, you know, to consider the other equities in his case, he did, which was another form of, you know, relief that she had discussed during the hearing. You know, he just didn't want to, he didn't want to talk about it. But I don't want to spend any more time in this jail, is what he said. And, you know, we all know what the conditions are like when, in the detention. I know. And he didn't know that we had an equally viable form of relief, a way of getting out of jail, get out of jail free card, and the fast-track removal. Well, and I think part of the problem is, if you take a look at Henry Cordova, which the defendant relied on in this case, I, there's a footnote in this case that may demonstrate that at that point when the hearing took place, it was unclear whether or not an immigration judge had to inform a defendant about. Isn't that the case where, I mean, there's a similar time frame. That case concerned a prior, let's see, what are we looking for now? What's the name of the case? A prior conviction. Actually, if you take a look at footnote four of Henry Cordova. Henry Cordova, 19. Okay. Basically what happened was there was a regulatory change between 1997 and 1998. And back in 1997, when this IJ hearing took place, the immigration judge had to inform the respondent of his apparent eligibility for any of the benefits enumerated in the paragraph. That's at 8 CFR 242.17A. And at that point, voluntary departure was not in that paragraph. It was within that chapter, but not within that paragraph. Within a matter of months, by 1998, immigration judges were required to inform respondents about voluntary departure because the language was changed. And again, this is in Henry Cordova, to state that the immigration judges had to inform an alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter. So there's a language change between 1997 and 1998. And the entire opinion in Henry Cordova turned on that change. Now, in Henry Cordova, it turned to the – it turned on that language to the benefit of the alien in that case because his hearing had taken place in 1998. Our hearing took place in 1997. The end of 1997, right? Yes, November. That's correct. But the statute existed at that time, correct? The statutory basis for it. Yes. But the regulatory – what's the word I'm looking for? The regulation that set out what an immigration judge had to specifically inform an alien of when they were before him or her, that changed between 1997 and 1998. Now, in this case, the immigration judge did speak of voluntary departure, even though under the regulation in effect at that time, she didn't actually have to. And as you've pointed out, she didn't do it as well as she could have. But – But there's no question that somebody in November of 1997, an alien, could have, even though there was no regulation, could have applied for voluntary – Yes, yes, yes. Mass track. Right. The form of relief was there. What the regulation speaks to is what does the IJ have to inform. But isn't it fair to assume, though, that a reasonably, you know, on top of an immigration judge would be aware of that relief? Well, and you can see her attempt. Right. Exactly. You can see her attempt. It just – could it have been more complete? You know, our approach to this comes from our case law. They need to inform the alien of relief that's available to them, reasonably available to them. Ironically, it almost would have been easier had she not informed him at all based on the regulation. What she was informing him was that you have no relief available. You know, that's what she's saying. You have no relief available, so what do you want me to do? Well, what she did was – what she's basically saying is you have another form of relief available. It's called voluntary departure. But you're not eligible. Right. She moves immediately on to that. That's correct. Because you're not eligible for it, so you have no relief available. And that is really – that's wrong advice to the alien. It's even worse than non-advice. It's wrong advice. Well, that's exactly what I was – it almost would have been better had she not tried to advise him of it. But I think what she was saying is not that he's ineligible to her based on her knowledge of his criminal record. In her discretion, she is finding that he's ineligible. Not that he's statutorily ineligible, but that in her determination, after looking at the facts of his case, as a matter of discretion, she finds that he is not. She kind of – she moved quickly on to that determination. Yeah. I have a real problem with the government's argument on that. Do you want to address the brief from official restraint? Absolutely. Give it all. You know, I think Judge Pius knows Bello-Vahena better than anybody. But, you know, in this case, I think it's plainly distinguishable from Bello. In Bello, what we had was a missing link in the chain. You know, we had an absent agent. The best that the government can say – well, in fact, the agent testified that there was continuous surveillance. And the best that he could say is he didn't know what the other agent saw. And in this case, at trial, we had every link in the chain. There was no evidence to the contrary that the agents, for a minute and a half, lost sight of the defendant. And that's, you know, ample time under official restraint case law. It's kind of interesting to me, this case, because, of course, I was on the panel in particular with Medina. And the question really is – the only reason they lost sight is because the two aliens ducked into the weeds. But the agent clearly would have had sight again if they had stood up or if they had gotten to the surrounding roads. So the agents knew, even though they could not visually see him, they had knowledge of exactly where they were the entire time. In Pacheco? No, in this case. Well, I mean, but I think in this case, the scope operator gets them to the field. Right. And it's surrounded by roads. And what he testifies is – and I was looking at all the surrounding roads to make sure that I didn't see them on the scope, right? So if they had gotten to the surrounding road, he would have seen them. They were – I mean, the way I kind of see this, they were trapped right there in that field. And whether or not they could see them may not be the test. It's whether you're free to – if you read the language in Pacheco, Medina, it's whether you're free to be at large and intermingle with the population. Well, these two little guys who were trapped down in the field, they weren't free to mingle. As soon as they got to a road, they would be seen. I think in Hernandez-Herrera, it was the same set of facts, where there were – there was no escape. I mean, they knew – No, no, no. Hernandez-Herrera was different. Hernandez-Herrera, they say that the alien escaped into the bushes and the officers then didn't know where they were because they were running into these bushes. But in this case, the entire time, the officers knew exactly where the two aliens were because if they stood up or they got to the road, they'd be on the scope. But there's still an appreciable amount of – I understand, you know, that it seems like they're locked in because there's essentially two sets of eyes. There's kind of the eyes that see the entire area and then the eyes that are right on the ground. But there is that period of time where neither set of eyes knows where they are. They know generally. They know where they are. They know exactly where they are. They just can't see them. That's why this case is interesting to me. It's like, you know, the next law exam. It's the next step in this. They know where they are. They just can't see them. The real question here, though, is simply whether or not there was sufficient evidence to support the instruction. That's all it really was. Right. And, you know, under Bayo Bahena, I think there probably was, but I don't know that this case is going to go that way. Well, you know, and as we said in our brief, I think those – the differences between – is it Bayo? I've been saying Bella the whole time. I'm sorry. Bayo Bahena. Bayo Bahena. In this case, I just – I don't think it's even close. You know, given the testimony that was presented at that trial and given the testimony that was presented at ours. It would be better for the district court judge to give the instruction and for you guys to argue, rather than to be in the position you're in today. Did you object to it? Given that instruction and the jury, you know. I rejected it. Right. You guys have, you know. I'm free on that one.  Thank you so much. Good argument. And do you have more to say? Well, I need to get up on my head. But I guess just on the remedy, I would request the court take into consideration that he's served full two years. All right. Thank you, counsel. United States v. DeSoto-Paleto. It's submitted. And we will take up Jossie v. Gonzalez.
judges: Beezer, Wardlaw, Paez